1SCHOTT, Chief Judge.
This is an appeal from a decision by the New Orleans Civil Service Commission concerning the discharge of Mary Preen from the classified service of the City of New Orleans. The commission reinstated Preen from the date of her discharge until the date when her supervisor testified during the hearing before the commission’s hearing officer. The City has appealed seeking to have Preen’s original termination upheld and Preen has appealed seeking unconditional reinstatement.
Preen was hired as Director of Nursing at Touro Shakespeare Home on January 2, 1990, by Paul Lumbi, the Administrator of the home. On October 16,1990, he suspended her for five days for refusing to comply with his order to report to his office and for general insubordination. On October 23, 1990, her appointing authority, Dr. Morris F.X. Jeff, Director of the City Welfare Department, notified her that a pre-termination hearing would be held on October 31 and gave the following explanation:
|2Your recent five (5) day suspension by Mr. Lumbi for insubordination indicates that your overall inability to perform your supervisory duties commensurate to your job description and administration expectation, have resulted in Mr. Lumbi’s recommendation that you be terminated from your provisional position of Nursing Services Supervisor.
On November 13, 1990, Dr. Jeff gave Preen her formal letter of termination which contained the following:
I am writing to inform you that your provisional status as Nursing Services Supervisor is hereby terminated effective November 13, 1990. You were suspended by Mr. Paul Lumbi, Superintendent of Touro Shakespeare; effective October 28, 1990 until I reached a determination on your continued employment with the Welfare Department. The reason for your suspension and termination is your inability as Director of Nursing to relate to your supervisor Mr. Lumbi as well as carry out the directions given you by Mr. Lumbi.
*1129 Preen, a white woman, took an appeal to the commission alleging “age and racial discrimination” in general and specifically that her provisional appointment was terminated “to replace [her] with an unqualified younger female of the same race as Dr. Jeff and Mr. Lumbi, who is not on the appropriate list of eligibles.” Lumbi and Jeff are black men.
Art. 10 § 8(B) of the Louisiana Constitution of 1974 prohibits discrimination against a classified employee because of race, provides for an appeal to the commission by an employee who is discriminated against, and places the burden of proof on appeal to the commission upon the employee alleging such discrimination. Rule 4.7 of the Civil Service Commission of the City of New Orleans repeats the constitutional mandate placing the burden of proof of the employee who alleges discrimination.
Following a prolonged hearing before a hearing examiner the | scommission on March 24, 1993, rendered an extensive decision which accurately summarizes the testimony and reaches the following conclusion:
Upon careful review and extensive deliberation, the Commission finds in this record a number of acts and omissions which indicate discrimination on the basis of both race and age. We are extremely concerned, and declare unequivocally that such conduct has no place in the merit system. That being said, the Commission also finds in the record strong indications that the legitimate differences in management skills and styles between Appellant and her supervisor, Lumbi, made the termination of her Provisional appointment inevitable. While the reasons offered for termination of a Provisional employee must be stated in writing, they need not be extensively detailed. Neither must such reasons relate to negative performance. However, the reasons given must be truthful, accurate and not based on factors prohibited by law.
This constitutes a finding that Preen carried her burden of proving racial discrimination against her culminating in her termination by her supervisor, Lumbi. This is even clearer when the above quoted conclusion is read in the context of the commission’s whole opinion including these factual findings:
Maria Perez testified that Randall regularly referred to Appellant, her supervisor, as “that white woman”. Placey and Joy Perez, both white females, testified that they and other white employees were harassed until they resigned. They further testified that, from actions and attitudes displayed, they were led to feel that Lumbi wanted an all-black staff. Lumbi admitted to ex post facto promulgation of policy and procedure statements which Appellant was charged with violating.
The above only scratches the surface of the great body of evidence produced by Preen to prove Lumbi’s discrimination against her because of race.
Milton Barquet, a black man who was an operating engineer at the Lnursing home, gave a litany of instances when Lumbi tolerated unruly and inappropriate behavior on the part of black employees of the type for which he sought to terminate Preen. Bar-quet testified that Lumbi made this statement at a meeting of the nursing home supervisors:
I do not generally care for white people. I do not generally care for them, you know.
According to Barquet, Lumbi made this statement in response to some accusations made by volunteers who worked in the program and who, said Barquet, “were mostly white.” Asked how often he recalled hearing Lumbi express that opinion about white people he answered, “Well, on a few other occasions I heard him express that he does not generally care for the volunteers ...” Bar-quet testified concerning Lumbi’s close relationship with Sherleen Randall, a young black woman whom he appointed to succeed Preen. Barquet stated that Preen was generally regarded as better qualified than Randall and that Lumbi tolerated the same kind of insubordination from Randall which he used as his excuse for terminating Preen. Barquet testified that when he started working at Touro in 1986 the blaek/white ratio of employees was 85%/15% compared to 99% black at the time of the hearing.
Shawn Temple who was the Business Manager of the home from May to October 1990 *1130 testified as to an employee who was chronically tardy, whose time he would dock, but who would talk to Lumbi and have Temple cover this up by changing the record. Tem-pie further testified that Lumbi tolerated absenteeism on this employee’s part.
Maria Placey was the Social Worker at the home. She testified she was Hispanic and had a Master’s Degree in Social Work with seven years | ¡^experience in the field. She was replaced by a black woman without a Master’s degree who had been working at Wal-Mart. She worked closely with Preen and praised her highly for the excellent job she did, her good attitude and her relationship with other employees and subordinates. She said other employees who were black would regularly “yell at” Lumbi which he tolerated. She saw Lumbi’s own secretary who was black “yelling” and slamming doors and witnessed “screaming matches” between Lumbi and the secretary. She also heard Cora Charles, a black, refer to Nathalie Leathern, a white employee, in Lumbi’s presence as “poor white trash”, but Lumbi neither said nor did anything to reprimand Charles for saying this. Asked why she was testifying, Placey stated that she thought Preen “was railroaded” and “to see that justice was done and that the right thing would be done in the situation. Hopefully, it would not happen to anybody else.”
Sarah Benjamin, a Nurse’s Assistant at Touro, worked under Preen’s supervision as well as Randall’s when the latter succeeded Preen. She contrasted their attitudes, with Preen being fair to the employees, communicative, and not inclined to raise her voice or yell at employees while Randall would yell at them, was preferential in her treatment of them, and was difficult to communicate with. When Randall got Preen’s job Benjamin heard Randall often refer to Preen as “that white woman.”
Barbara Jackson, a twenty-seven year old black woman was also a Nursing Assistant who served under both Preen and Randall and who attested to Preen’s good attitude and ability as contrasted with Randall’s. She labeled Randall’s supervisory ability as a “joke”. She described Randall as unprofessional, constantly screaming and yelling at people. She too heard Randall often refer to Preen as “That white woman this and that white woman that.” Asked whether she considered these references by Randall to |aPreen as derogatory, Jackson stated:
“She was being derogatory. She was being racist.”
After a colloquy between Jackson and the Hearing Examiner about that statement being only an impression, the following ensued:
WITNESS:
Some of the statements that she would say were being directed towards me, and I felt that it was a racist remark.
MR. MISSHORE:
Well, to say that you felt that it was a racist remark is different from saying that Ms. Randall is a racist.
Linda Carson, a white woman, was Assistant Director of Nurses at Touro from 1988-1989 under Lumbi’s supervision. Asked whether he ever treated her in a manner that called attention to her being white, she gave the following testimony:
A A number of times he did, yes.
Q Would you give us some specifics, please?
A I think the most specific case that I can state was when they came and it was both Mr. Lumbi and Ms. Ray, they came to me and asked me to fire individuals because I was white, and it would come better out of a white person. I kept asking them why, and they would never give me really a good solid reason, but they just said that was within my job description. They would say that to me, and Ms. Ray was our Director. So, I said okay and I would do it.
Q When you say Ms. Ray, she was the Director of what?
A The Director of Nurses.
Q And what was her skin color?
A She was black. She is a very fair skinned black.
|7Q, So, the Administrator and the Director of Nursing would come to you and ask you to fire other employees?
A Other black employees, yes, because it was better coming from a white person.
*1131 Q All right. Did you ever overhear Mr. Lumbi in your presence refer to you in a way that referred to your skin color or to some characteristic of your race?
A Mostly whenever I entered the room, it was more like, “Well, she is here now or we do not want to talk of her or she understands. She is not the same. She is not the same.” They were very subtle.
Q Was your impression that your skin color mattered to Mr. Lumbi?
A Yes, my skin color mattered.
Q Did Mr. Lumbi ever refer to you as your kind or that kind?
A Oh, yes.
Q How often?
A That is very difficult for me to state.
Q Was it more than once?
A Oh, yes, it was at least more than once.
Q Did you ever personally observe Paul Lumbi treat female, young female black employees in a preferential manner?
A I would say so, yes. They were, again, very subtle. He would take them into the office whenever we tried to reprimand them and mostly this was in nursing. He would take them into the office, and after a period of time which we were not even privy to these conversations, they would come out and everything was all better. We never knew what happened.
On cross examination Carson further testified as follows in response to a question as to how Lumbi would call attention to her being white:
IsA The mannerisms were if you walked into a room and now I was the Assistant Director, and I was in Management. Besides me at that particular time, there was one (1) other white person who worked the 11 (eleven) to 7 (seven) shift. She was an L.P.N. Her name was Susan Delaney. I know where she lives. It is over here. She still lives over there. She can testify to this as well if you want to corroborate the story. If he would walk into a room and it was ... Well, she is here now. It was the general tone that was set, and then I was told ... Well, we hired one (1) of your kind today. That was (1) of the comments that came through. I said, “One (1) of my kind? What does that mean?”
Q When they said that they hired one (1) of your kind, did that mean that they hired another nurse or another white person?
A Another white person.
Q And had they hired another white person?
A Yes, they did.
Q So, then, they were not lying when they said that they hired another one (1) of your kind?
A It was the attitude with which they said it.
Further along in cross examination the following ensued:
Q So, you just did not like the way that Mr. Lumbi expressed himself?
A When you are sitting in the room full of all black people who are professionals, and when somebody says, “Yes, we hired one (1) of your kind today,” it is pretty embarrassing whether you are white or whether you are black. I mean, what kind am I?
Q But that is just embarrassing to you?
A Well, I think that is pretty racial also.
Q You had your feelings hurt in other words?
A Well, wouldn’t you?
MS. JONES:
Objection. The witness’s feelings are irrelevant.
MS. MISSHORE:
^Overruled.
BY MR. EARLY:
Q So, you just did not like the tone of Mr. Lumbi’s voice?
A It was not just his voice. Ms. Ray and he would both thither, you know. They would talk to each other. They would whisper to each other, and I would say, “Well, what is so funny?” They would say, “You do not understand. You are not the right kind.” You know, it was like you felt very lost in this situation.
Q You never heard Mr. Lumbi ever make any racial jokes about white people, did you?
*1132 A I cannot recall a specific instance, but I know that there were a lot of laughter between them.
Q It was directed towards who?
A It was directed towards me and it was directed just generally. I do not like to use the derogatory comments that would come out of their mouths. I do not refer to people that way.
In her testimony Preen testified that her termination was unrelated to her job performance, but was orchestrated by Lumbi because he wanted an all black staff; that Lumbi, with Dr. Jeffs approval, pursued the policy: “Anyone who was white was either kept on provisional status or was harassed until they quit ...”
The evidence was overwhelming that Lum-bi at least tolerated, if not cultivated, an atmosphere of intolerance and antagonism toward white employees under his supervision. Furthermore, the only reasonable inference or conclusion that can be drawn from the evidence is that Preen’s termination was motivated purely by racial discrimination on Lumbi’s part. The reasons he gave for discharging her included all sorts of conduct such as poor attitude, insubordination, unpro-fessionalism, chronic tardiness, failure to follow directions and to communicate were all regularly tolerated | min other employees, especially black employees, but were used as his basis for terminating Preen.
The Commission specifically rejected Lum-bi’s credibility and found that he completely failed to substantiate the ostensible reasons he gave for firing her. The commission stated that Lumbi criticized Preen for failing to perform duties he never outlined for her in the first place, he countermanded and undermined her authority, he charged her with violations of policy which were never promulgated, and he provided no documentation for the misconduct he charged Preen with even while citing unproduced documentation. The commission tersely concluded:
Lumbi’s testimony as to Appellant’s attendance and neglect of duty is not credible.
The Commission while totally rejecting Lumbi’s testimony, noted the following with respect to Preen’s appointing authority, Dr. Jeff:
It is noted that Appellant, a senior professional employee, attempted to meet with Dr. Morris Jeff on several occasions to discuss her concerns, but was never granted a meeting. Dr. Jeff, the Appointing Authority, testified that he relied on the supervisors’ recommendation in such matters, and never met with employees.
Finally, the commission criticized the appointing authority for allowing the destruction of subpoenaed documents while he was challenging the subpoenas.
Thus, not only did the commission conclude that Preen carried her burden of proving discrimination, but also it found that the appointing authority failed to carry his burden of proving cause for Preen’s termination. As discussed above, these findings and conclusions are amply supported by the record. Nevertheless, the commission did not reinstate Preen | ^unconditionally, but concluded as follows:
It is the commission’s ruling that not until the hearing of October 30, 1991 did Lumbi articulate adequately for Appellant his reasons for her dismissal. Not until that day was the Appointing Authority available to be confronted by Appellant on his decision to dismiss her. Thus a basic element of equitable treatment of this employee was delayed from October 15, 1990 until October 30, 1991. The Commission finds, in this violation of its rules of procedure, a constructive suspension of the decision to dismiss. Taken together with the dilatory and obstructive failure by Lumbi and other representatives to produce subpoenaed materials allegedly supporting the dismissal, these acts and omissions lead the Commission to conclude that Appellant was entitled under Rule IX, Section 1.3, to be retained in this position until October 23, 1991. The suspension and dismissal are therefore voided and superseded by dismissal effective October 23, 1991. Appellant is entitled to all back pay and emoluments for the period from October 16, 1990 through October 23, 1991.
*1133 We have concluded that the commission erred as a matter of law by failing to reinstate Preen unconditionally.
The most important consideration which the commission failed to make was the effect upon the case of its finding of discrimination. Once Preen established that her discharge was a matter of racial discrimination further inquiry into Lumbi’s (Jeffs) reasons for the discharge is unnecessary. The process was poisoned. She was the victim of their discrimination and any reasons they would concoct for the discharge were nugatory. Consequently, the reasons Lumbi gave at the hearing on October 30, 1991, were without effect because in discharging her he was engaging in racial discrimination.
Because of this conclusion we need not address the question raised in the commission’s decision of whether a disciplinary proceeding which is invalid because of the failure of the appointing authority to furnish the | ^employee a statement in writing of the reasons therefore as required by Rule IX Section 1.3 can somehow be validated when the appointing authority or his agent gives reasons for the first time at the hearing. But we do not intend to convey the impression that we approve of this theory.
In its brief the City makes much over the Preen’s supposed status as a transient or provisional as opposed to a permanent employee. However, the City concedes that in the case of racial discrimination all employees regardless of status are entitled to the same redress. Since Preen was the victim of racial discrimination when discharged, she is entitled to reinstatement regardless of her status. Parenthetically we note that the City filed an exception entitled “No Right Cause of Action” to Preen’s initial appeal to the commission based on the allegation that she had not received permanent status in the civil service, but the record shows that the appointing authority withdrew this exception before the healing began.
Accordingly, that part of the decision of the Civil Service Commission of the City of New Orleans vacating the dismissal of Mary Preen from the civil service of the City of New Orleans and reinstating her in her position is affirmed; that part of the decision making her dismissal effective on October 23, 1991, is reversed, and she is unconditionally reinstated to her position entitled to all back pay and emoluments.

AFFIRMED IN PART; REVERSED IN PART. .

WARD, J., concurs with reasons.
JONES, J., dissenting.